**Barry L. GAVETTE and Donna V. Gavette, Plaintiffs,**

v.

**The WARNER & SWASEY CO. and Work Wear Corporation, Defendants.**

**No. 90–CV–217.**

United States District Court, N.D. New York.

July 17, 1997.

James P. Godemann, Petrone, Petrone Law Firm, Utica, NY, for Barry L. Gavette, Donna V. Gavette.

Arthur H. Thorn, Thorn, Gershon Law Firm, Albany, NY, for Defendant Warner & Swasey Co.

## MEMORANDUM DECISION and ORDER

SCANLON, United States Magistrate Judge.

Plaintiffs filed this suit to recover for personal injuries sustained in a 1987 work-relat-

ed accident by Barry Gavette.[1] Jurisdiction in this matter is based upon diversity of citizenship. 28 U.S.C. § 1332(a). The parties have consented to have the undersigned conduct any and all further proceedings in this case, including the entry of final judgment, in accordance with 28 U.S.C. § 636(c).

Plaintiff formerly was employed as a lathe operator by Goulds Pumps, Inc. ("Goulds Pumps"), in Seneca Falls, New York. On March 30, 1987, his left arm was pulled suddenly into the lathe he was operating after his sleeve became entangled in moving machinery. He alleges that he suffered serious and debilitating injuries as a result of the accident. In 1990 plaintiffs brought suit alleging negligence, products liability, and breach of warranty against The Warner & Swasey Company ("Warner & Swasey") and the Work Wear Corporation ("Work Wear"), who is no longer a party to this suit.[2] Upon information and belief, plaintiffs plead that Warner & Swasey, a Michigan corporation, was the manufacturer and seller of the lathe that plaintiff had been operating.

During the course of litigation, however, the parties concluded that Warner & Swasey could not have manufactured or sold the lathe in question because its manufacture and sale to plaintiff's employer predated the incorporation of Warner & Swasey by more than a quarter of a century: the lathe was sold to Goulds Pumps in 1957; defendant was incorporated in Michigan in 1984. If Warner & Swasey is liable in this matter, therefore, it must be a successor in liability. To resolve this issue, the Court conducted a hearing on September 14, 1994 to determine whether defendant might be held liable under a theory of successor liability. For the following reasons, the Court finds that defendant potentially may be held liable under a theory of successor liability.

## BACKGROUND

Warner & Swasey is the culmination of a series of business transactions and decisions that date back many years. The original predecessor of Warner & Swasey was the similarly named Warner & Swasey Co. of Ohio ("Warner & Swasey–Ohio"), which was incorporated in that state in 1928. It was that corporation, now defunct, that manufactured and sold the lathe in question to Goulds Pumps in 1957. In 1980, Warner & Swasey–Ohio was acquired by the Bendix Corporation ("Bendix"), and merged into a subsidiary of Bendix. The corporation formed as a result of that transaction was The Bendix Acquisition Company ("Bendix Acquisition"), and it expressly assumed all of the liabilities of Warner & Swasey–Ohio. Moreover, it continued to do business as The Warner & Swasey Company. Bendix itself was acquired in 1982 by the Allied Corporation ("Allied"), which continued to hold Bendix Acquisition as an independent subsidiary. A year later, Bendix Acquisition filed a name change to Bendix Automation Company ("Bendix Automation").

In 1984, Cross & Trecker Corporation ("C & T Corp.") and Bendix entered into a Purchase Agreement. As a result of the agreement, C & T Corp. acquired substantially all of the assets of Bendix Automation and assumed some of its liabilities. At roughly the same time that C & T Corp. and Bendix entered into the Purchase Agreement, C & T Corp. incorporated a new subsidiary in Michigan: C & T Subsidiary, Inc. C & T Corp. assigned all of the assets and liabilities that it had acquired in the recent Purchase Agreement to C & T Subsidiary, Inc., which in turn changed its name to Warner & Swasey. It is this Warner & Swasey that is the defendant in the instant action.

The Purchase Agreement is explicit regarding those liabilities that C & T Corp. assumed in its transaction with Bendix. As set forth in the Purchase Agreement, C & T Corp. refused to assume "any liability or obligation for damages ... based on product liability or product warranty relating to the

---

1. "Plaintiff" herein refers to Barry Gavette; "defendant" herein refers to The Warner Swasey Company.

2. By Stipulation dated January 9, 1992, plaintiffs dismissed their claim against Work Wear; by Order and Stipulation signed by the Hon. Neal P. McCurn, Senior United States District Judge, on July 29, 1993, Warner & Swasey discontinued its cross-claim against Work Wear.

products sold by [Bendix] prior to the Closing Date, except for any such liability or obligation" based upon:

> (a)(I) a product of [Bendix] other than a rebuilt product which was sold during the thirty-six month period immediately preceding the Closing Date (a "Current Product"), or (ii) *a product ... other than a rebuilt product which is substantially the same in performance. capability and function to, and is the same or substantially similar in design (including safety features and size) to, a Current Product;* and (b) an event happening after the Closing Date.

Purchase Agreement ¶ 2.6.1 (emphasis added).

It is undisputed that plaintiff's injury was "an event happening after the Closing Date"—e.g., April 19, 1984.[3] If defendant succeeds in liability for plaintiff's injury, then the lathe that caused the injury: (1) cannot have been rebuilt; and (2) must be substantially the same in performance, capability, and function—and the same or substantially similar in design, including safety features and size—to a Current Product. A Current Product would include a lathe sold by defendant's corporate predecessors within a three-year period prior to April 19, 1984.

The lathe that injured plaintiff has been identified as a model I-A Warner & Swasey extra heavy duty saddle-type turret lathe ("model 1-A"). At the hearing the parties agreed that among the lathes manufactured by defendant's predecessor during the three-year period immediately preceding the Closing Date were models 3-A, 4-A and 5-A Warner & Swasey extra heavy duty saddle-type turret lathes ("models 3-A, 4-A, and 5-A," respectively). No model 1-A lathes were produced during that time period.[4] At issue is whether the model 1-A lathe is substantially the same in performance, capability, and function and the same or substantially

similar in design, including safety features and size, to a *model 3-A, 4-A, or 5-A lathe.* Based upon the evidence, the Court finds that the model 1-A and model 3-A are substantially the *same in performance,* capability, and function, and are *substantially* similar in design, including *safety* features and size.

### I. Burden of proof and choice of law.

■ This case is before the Court as a diversity action, which means that ultimately state law will govern all issues of substantive law. *See Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The issue of which party has the burden of proving that successor liability exists raises a question of substantive law. *See Prudential Ins. Co. of America v. Schroeder,* 414 F.2d 1316 (5th Cir.1969), *cert. denied,* 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752. Under ordinary circumstances, when faced with an issue of substantive law in a diversity action, the Court would determine which state's substantive laws should apply; however, as both Michigan and New York would place the burden of proof on plaintiffs to prove that successor liability exists, it is premature for the Court to undertake a choice of law analysis at this juncture. *See, e.g., Lemire v. Garrard Drugs,* 95 Mich.App. 520, 291 N.W.2d 103 (1980) (dismissing complaint sounding in products liability because plaintiff had not alleged sufficient facts to support finding of vicarious or successor liability); *Heights v. U.S. Electrical Tool Co.,* 525 N.Y.S.2d 653, 138 A.D.2d 369 (1988) (dismissing complaint because plaintiff had not shown how defendant could be held liable as corporate successor under exception to general rule that asset purchasing corporation does not succeed predecessor in liability).

### II. "[S]ubstantially the same in performance, capability, and function. . . ."

■ The Purchase Agreement provides that defendant, as the successor corporation,

---

**3.** The Closing Date is listed in the Purchase Agreement as being "April 13, 1984, or at any other such time, date and place as parties may mutually agree to in writing." Purchase Agreement at ¶ 8.1. The actual Bill of Sale and Instrument of Assignment was executed on April 19, 1984. In any case, the Closing Date was April 1984.

**4.** According to defendant's expert witness, Richard H. Shively, Warner & Swasey–Ohio produced model 1-A extra heavy duty saddle-type turret lathes from World War I to the late 1970s. The company had produced a model 2-A lathe, as well, from roughly 1910 until the late 1970s. *The production of the model 3-A, 4-A and 5-A* lathes lasted until the mid–1980s.

will assume liabilities for a previously manufactured product that is, *inter alia*, "substantially the same in performance, capability and function" to a Current Product. Plaintiffs' burden, therefore, is to present evidence that those specified characteristics of the model 1–A are substantially the same to any other lathe manufactured by defendant's corporate predecessor from April 1981 to April 1984. Plaintiffs meet this burden by demonstrating that the model 1–A is substantially the same in performance, capability and function to the model 3–A saddle-type turret lathe, which was manufactured during that time period.

### A. Performance.

When pressed to identify differences in performance among the several models of saddle-type turret lathes, Richard H. Shively, a long-time employee of Warner and Swasey–Ohio, could only think of one major difference in the models: handling time.[5] Plaintiffs' expert, Irving Rozian, stated that with regard to performance, there were no dissimilarities between the model 1–A and 3–A. While he admitted that there are differences in the headstock of the 1–A and 3–A in their internal gear boxes, he claims that there is no difference in the performance of the models, as each provides the spindle with the necessary torque and desired speed to machine a product. Based upon either expert's assessment, it appears to the Court that the model 1–A and 3–A are substantially the same in performance.

### B. Capability.

Plaintiffs' expert explained the difference between capability and capacity as follows: "In my aged physical condition, I'm not capable of doing a backward flip on a trampoline.

I'm capable of jumping. The height to which I can jump is my capacity to jump." (Transcript of November 29, 1994 Hearing at 125:10–12). By way of illustration, both the model 1–A and 3–A are capable of lathing either round, square, or hexagonal metal bars; but whereas the model 1–A can accommodate round bars that are up to three inches in diameter, the 3–A can accommodate round bars with a diameter of twice that size. Both lathes are capable of machining similar products, albeit to different dimensions.[6] Some differences do exist between these models. The model 1–A can accommodate a collet chuck, which is used to hold a bar stock or bar type bore, as opposed to a chucking-type part. The model 3–A cannot accommodate a collet chuck because that type of chuck is too small for it. Nonetheless, when viewed as a whole, these differences are minor. The model 1–A and 3–A enjoy substantially the same capabilities, though their capacities differ.

### C. Function.

The basic design of the saddle-type turret lathe is essentially identical, although the dimensions and mass of each model differs;[7] and because saddle-type turret lathes share identical components and characteristics, the function of these lathes is the same: they accomplish manual turning operations. Indeed, as noted by Shively, anything an operator could do on a model 1–A could be done on a model 3–A.[8] The Court, therefore, finds that the function of the model 1–A is "substantially the same" as that of the model 3–A.

### III. "[T]he same or substantially similar in design (including safety features and size). . . ."

Both the model 1–A and 3–A are heavy duty saddle-type turret lathes. Over the

---

**5.** Shively explained that because the tool slides and the moving elements on the large machine are considerably more massive than on the smallest machine, and because those elements have further to move, it takes more time to present the cutting tools to the work piece on a larger machine than on a smaller machine.

**6.** Plaintiffs' expert cited a rocker bolt as an example of a product that would be manufactured on a saddle-type turret lathe, such as the model 1–A or 3–A. The advantage of either of these lathes in manufacturing a rocker bolt is that

unlike other lathes, these are capable of using up to ten different tool set-ups in succession to produce such a part. This capability, according to the expert, is why the saddle-type turret lathe is ideally suited to be a "production lathe."

**7.** *See* discussion, *supra*.

**8.** Shively also stated that he thought the model 3–A may have had more capabilities than the model 1–A, though he did not specify these capabilities.

years, Warner & Swasey–Ohio and its successors manufactured several "families" of lathes, including the saddle-type turret lathe. As a general rule, lathes within a given family share common components and characteristics. As previously mentioned, five models of saddle-type turret lathes were manufactured: the 1–A, 2–A, 3–A, 4–A and 5–A. The model 1–A is the smallest of these lathes; the model 5–A is the largest.

Warner & Swasey–Ohio characterized saddle-type turret lathes as "larger machines ideally suited for extra heavy duty jobs—particularly those requiring long, accurate cuts." (Plaintiffs' Ex. 16 at 3, 6).[9] The distinguishing characteristic of the saddle-type turret lathe is its movable saddle, affixed to which is the end-working hexagon turret. Each side of the turret houses a machine tool, which is used to fashion a cut on the bar of metal that is being lathed. Together, the saddle and turret are capable of traveling horizontally up to the entire length of the bedways of the lathe, depending upon the desired length of the cut. All saddle-type model lathes feature these (and other) components, though the dimensions of these components increase as the model number increases. For instance, the bedways on a model 4–A are larger than those on a model 2–A—which allows the model 4–A to make larger cuts. Absent this difference in the dimension of components, the basic design of all saddle-type turret lathes—including of the models 1–A and 3–A—is practically identical. The question, therefore, is whether the safety and size features of the models 1–A and 3–A are "the same or substantially similar."

The basic safety instructions for saddle-type turret lathes do not differ, regardless of which model an operator might use.[10] Moreover, in so far as the built-in safety features of the model 1–A and 3–A lathes are concerned, those features are essentially the same. Both models have slip clutches and slash shields.[11] Both models are designed to shield an operator from flying metal chips, and also require that a coolant be sprayed upon the cutting tool to cool and lubricate it. Other similarities in safety features exist as well.

The size of the model 1–A differs from the 3–A, as the 3–A is larger. Whereas the net standard weight of the model 1–A is 7,000 lbs., the net standard weight of the 3–A is 12,000 lbs. Naturally, the model 3–A also features larger dimensions than the 1–A. The length (with bar feed) of the model 3–A is just over eighteen feet, eight inches, for instance, while the length (with bar feed) of the 1–A is sixteen feet, five inches. Still, if defendant had wanted to limit it's liability to only those products manufactured prior to its incorporation that were identical in size to a Current Product, it could have. It did not do so. Rather, defendant specifically assumed liability for those products manufactured by its predecessors that are the "same *or substantially similar*" to a current product.

By itself, "similar" means "related in appearance or nature; alike though not identical";[12] but "similar" is qualified by the word "substantially." As it is so qualified, the Court finds that the degree of likeness required by this phrase encompasses the likeness in size of the model 1–A and 3–A saddle-type turret lathes. Accordingly, plaintiffs have met their burden of proving that the model 1–A is "substantially similar" to the model 3–A in design, including safety features and size.

---

9. Plaintiffs' expert noted that heavy duty lathes, such as the saddle-type turret lathes, are rarely used to produce consumer parts. Instead, such lathes are used for making things such as military and industrial equipment, machine tools and locomotive parts.

10. For example, Warner & Swasey–Ohio's safety manual warned saddle-type turret lathe operators that they should always protect their eyes, wear steel-toed safety shoes, avoid wearing long sleeves or loose clothing, and secure all cutting tools properly before operating the lathe.

11. The "slip clutch" is a device designed to stop the motion of the turret or of the cross slide if either meets an obstruction. The "slash shield" is a semi-circular hood that may be brought down over the chuck to prevent the operator from coming into contact with the chuck.

12. THE AMERICAN HERITAGE COLLEGE DICTIONARY 1270 (3d ed.1993).

## IV. Was the lathe "rebuilt"?

At the hearing, defendant raised as a defense the issue of whether the lathe in question was rebuilt. As was set forth in the purchase agreement, defendant does not assume liability for a product manufactured by its predecessors—even if it meets the criteria listed above—if that product is rebuilt. Based upon the evidence defendant presented at the hearing, which was limited to plaintiffs ambiguous deposition testimony on the matter, the Court cannot find definitively that the lathe at issue was rebuilt.

### CONCLUSION

The lathe that plaintiff had been operating at the time of his injury, a model 1–A saddle-type turret lathe, is substantially the same in performance, capability, and function—as well as the same or substantially similar in design (including safety features and size)—to the model 3–A saddle-type turret lathe. Defendant's predecessors manufactured the model 3–A through the mid–1980's, which means that under the terms of the Purchase Agreement the model 3–A is a Current Product. According to the terms of defendant's Purchase Agreement, therefore, and absent a finding that the lathe that injured plaintiff was rebuilt, the Court finds that defendant may be held liable under a theory of successor liability.

**SO ORDERED.**